Gregory Y. Porter, *pro hac vice* pending
  gporter@baileyglasser.com
James L. Kauffman, *pro hac vice* pending
  jkauffman@baileyglasser.com
**BAILEY & GLASSER LLP**
910 17th Street NW, Suite 800
Washington, DC 20006
Telephone: 202.463.2101
Facsimile: 202.463.2103

James E. Magleby (7247)
  magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
  parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiffs and the Putative Class

---

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **KELLY JESSOP, an individual, on behalf of himself and all others similarly situated,**<br><br>   **Plaintiff,**<br><br>**v.**<br><br>**DALLIN LARSEN, an individual, HENRY MARSH, an individual, RANDY LARSEN, an individual, MACHIEL KENNEDY, an individual, RALPH CARSON, an individual, AMY COWLEY, an individual, MARK RAWLINS, an individual, PORTER HALL, an individual, STEPHEN J. HALL, an individual, DOES 1-10, and BANKERS TRUST COMPANY, a Delaware corporation,**<br><br>   **Defendants.** | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br><br><br><br><br><br><br><br><br>**Case No.  2:14-cv-00916-BSJ**<br><br>**Honorable Bruce S. Jenkins** |

Plaintiff Kelly Jessop ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge, the investigation of his counsel, and upon information and belief as to all other matters, as to which allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

## INTRODUCTION

1.      Plaintiff was a corporate trainer employed by MonaVie, LLC ("MonaVie"). Plaintiff is vested in MonaVie's Employee Stock Ownership Plan ("ESOP"). In recent months, Plaintiff was locked out of his online ESOP account and is unable to view documents related to the ESOP or obtain any information about his shares. As alleged below, Plaintiff and the Class he seeks to represent have been cheated out of their hard-earned retirement benefits as a result of violations of the fiduciary duties and prohibited transactions under the Employee Retirement Income Security Act of 1974 ("ERISA") by Bankers Trust Company ("Bankers Trust" or "Trustee") and such other persons who may have served as fiduciaries to the ESOP, and the knowing participation by the Individual Defendants named herein (all Defendants other than Bankers Trust) in these violations of ERISA.

2.      MonaVie is a privately held company that manufactures and distributes products made from blended fruit and vegetable juice concentrates, powders, and purees through a multi-level marketing business model. On November 17, 2010, MonaVie (and/or its principal shareholders) sold an unknown percentage of its shares for $186 million to the ESOP (the "ESOP Transaction" or "Transaction"). Bankers Trust represented the ESOP as Trustee in the 2010 ESOP Transaction. The ESOP Transaction allowed MonaVie and its principal shareholders to unload thousands of shares in MonaVie at grossly inflated values and saddle MonaVie's own

2

employees with a crushing loan to finance the Transaction. Bankers Trust, as Trustee for the ESOP, completely failed to fulfill its duties to the ESOP and ESOP participants like the Plaintiff.

3.      In the years prior to the ESOP Transaction, MonaVie was mired in negative headlines and lawsuits with consumers, competitors, and distributors. MonaVie was accused of false and misleading advertising, questionable business practices in their multi-level marketing scheme, and other practices that called into question the value of the company's stock. In this environment, MonaVie and the selling shareholders knew they could not secure bank financing for a loan to the ESOP to acquire shares of MonaVie because the collateral for the loan would be near worthless MonaVie stock. Instead, MonaVie and the selling shareholders, with Bankers Trust's cooperation, caused MonaVie to loan the money to the ESOP. Bankers Trust allowed the ESOP to borrow $186,496,985 payable in full over fifteen years at a rate of ten percent (10%) per annum, a rate that was more than twice the 4.25% rate for similar financing. Thus the selling shareholders saddled the ESOP and MonaVie employees with $186 million of debt, payable to MonaVie and the selling shareholders, at more than double the going interest rate and unloaded thousands of shares in MonaVie at grossly inflated values. Bankers Trust should never have allowed this. It failed utterly to perform its duties

4.      The numerous red flags about MonaVie and its principal shareholders and distributors from readily available public sources would have alerted any reasonable financial institution to the defects in a high-stakes transaction in MonaVie stock. Indeed, MonaVie was in a bitter litigation against Amway Corp. over false and deceptive sales practices and illegal recruiting of Amway distributors. The public record in this lawsuit cast serious doubts on MonaVie's business practices and future. Thoroughly reviewing and evaluating a critical lawsuit

is basic due diligence in any financial transaction. But Bankers Trust ignored this record and numerous other warning signs and failed completely in its due diligence and duties as ESOP Trustee.

5.     The ESOP's MonaVie stock lost just over one third of its value, $66 million, within 44 days after the Transaction, showing that the Transaction was a get-rich-quick scheme for the selling shareholders at the expense of MonaVie employees.

6.     As of January 2014, the ESOP's MonaVie shares were only worth 6 cents a share, $774,000, a loss of 99.95%. But the ESOP still owes MonaVie and the selling shareholders over $265 million.

7.     Defendant Bankers Trust caused the ESOP to pay substantially more than the fair market value for MonaVie's stock, relied upon inflated financial projections and a flawed valuation report in valuing MonaVie's stock for the 2010 ESOP Transaction, and failed to give appropriate consideration to material adverse facts about MonaVie widely available to the public. Further, Bankers Trust failed in its fiduciary obligation to seek to mitigate the losses to the ESOP. Currently, ESOP participants cannot even obtain a statement of the value of their shares and their shares are believed to be currently worthless.

8.     MonaVie's founders, principal shareholders, and Board ("Individual Defendants") knowingly participated in Bankers Trust's breach of duty. Each of them was intimately familiar with the aforementioned news headlines and litigation challenging MonaVie's multi-level marketing model as a Ponzi scheme. Each of them knew that MonaVie's days were numbered because virtually all sales of its products were to downstream distributors as opposed to real consumers, and downstream distributor sales were rapidly decreasing. Many of these Individual

Defendants were plan fiduciaries in their own right or controlled the plan's fiduciaries. Once the Ponzi scheme collapsed, the individual defendants escaped by unloading their stock onto their own employees' ESOP. The Individual Defendants walked away with millions of dollars for nearly worthless stock and saddled the ESOP with a $265 million liability.

## JURISDICTION AND VENUE

9.     This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiff to enjoin acts and practices that violate the provisions of Title I of ERISA, to require Defendants to make good to the Plan losses resulting from fiduciary violations, to restore to the Plan any profits that have been made by the breaching fiduciaries and parties in interest through the use of Plan assets, and to obtain other appropriate equitable and legal remedies in order to redress violations and enforce the provisions of Title I of ERISA.

10.     This Court has subject matter jurisdiction over this action pursuant to ERISA§ 502(e)(2), 29 U.S.C. § 1132(e)(2).

11.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.§ 1132(e)(2), because some or all of the events or omissions giving rise to the claims occurred in this District, the ESOP is administered in this District, and several of the Individual Defendants reside or may be found in this District.

## PARTIES

12.     Plaintiff Kelly Jessop is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the ESOP. Kelly Jessop resides in Salt Lake City, Utah. Kelly Jessop was employed by MonaVie as a corporate trainer and is vested in MonaVie shares via his account in the ESOP. The value of his MonaVie shares in his ESOP account has declined dramatically since he

received them. As of November 2014, Plaintiff was locked out of has been unable to obtain any information regarding his MonaVie shares or his ESOP account. When Plaintiff called customer service for the ESOP online portal, he was told that MonaVie is evaluating the stock price and was given no estimated date when that evaluation will be complete.

13.     Defendant Bankers Trust is and was the Trustee of the ESOP during the 2010 ESOP Transaction. Bankers Trust at all relevant times was a "fiduciary" under ERISA because it was named as the Trustee. As Trustee, Bankers Trust had exclusive authority to manage and control the assets of the ESOP and had sole and exclusive discretion to authorize the 2010 ESOP Transaction. Defendant Bankers Trust at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14). Defendant Bankers Trust is a Delaware corporation headquartered in Iowa.

14.     At all relevant times, Dallin Larsen ("D. Larsen") was the Chief Executive Officer and Chairman of MonaVie. D. Larsen was responsible for MonaVie's strategic development, creation of its products, and services distribution channel. D. Larsen has a Bachelor of Science degree in Finance from Brigham Young University. D. Larsen was a principal shareholder of MonaVie and owned, upon information and belief, at least 17% of MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times, D. Larsen was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). D. Larsen stepped down as Chairman and CEO in 2014. D. Larsen has an 8,900 square foot mansion in Key Largo, Florida, and also resides in Wasatch County, Utah.

15.     Prior to founding MonaVie, D. Larsen was the vice president of sales for Dynamic Essentials, a Florida-based company selling fruit juice called Royal Tongan Limu,

where D. Larsen claimed to increase revenue by 300%. During D. Larsen's tenure at Dynamic Essentials, the Food and Drug Administration ("FDA") warned Dynamic Essentials the claims on the company's website that its juice could "treat various diseases such as cancer, arthritis, and attention deficit disorder" were illegal. In 2003, the FDA oversaw the destruction of 90,000 bottles of Royal Tongan Limu.

16.     At all relevant times, Randy Larsen ("R. Larsen") was the Director and Senior Vice President of Marketing of MonaVie. R. Larsen is the brother of D. Larsen. R. Larsen was responsible for MonaVie's product and service development, development of marketing strategies and new market identification, and company image development. R. Larsen has a Bachelor of Science degree in Business Management from Brigham Young University. R. Larsen was a principal shareholder of MonaVie and owned, upon information and belief, at least 11% of MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times, R. Larsen was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). R. Larsen resides in Las Vegas, Nevada.

17.     At all relevant times, Henry Marsh ("Marsh") was the Director and Executive Vice President of Sales of MonaVie. Marsh was responsible for MonaVie's recruitment and management of its product and service distribution channels, management of its sales associate compensation program, product and service development and public presentations. Marsh has a Bachelor of Science degree in Economics from Brigham Young University and a Juris Doctor degree from University of Oregon, School of Law. Marsh was a principal shareholder of MonaVie and owned, upon information and belief, at least 11% of MonaVie's stock prior to the

2010 ESOP Transaction. Thus, at all relevant times, Marsh was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Marsh resides in Bountiful, Utah.

18.     At all relevant times, Machiel "Mike" Kennedy ("Kennedy") was the Chief Medical Officer and Vice President of Professional Services of MonaVie. Kennedy was responsible for MonaVie's strict adherence to medically supported product and program development, product and services design, corporate and government consulting, medical community relationships and on-line patient services. Kennedy held medical licenses in Indiana and Florida. Kennedy has a Bachelor of Science degree in Biology from Central State University and a medical degree from Indiana University, School of Medicine. Kennedy was a principal shareholder of MonaVie and owned, upon information and belief, 10% of MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times, Kennedy was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Kennedy resides in Clearwater, Florida.

19.     At all relevant times, Ralph Carson ("Carson") was the Chief Science Officer and Vice President of Product Development of MonaVie. Carson was responsible for establishing and monitoring scientific guidelines for the development of MonaVie's products and services, sales associate training product presentations, and corporate educational consulting. Carson has a Bachelor of Science degree in Pathology from Duke University, a Bachelor of Science degree in Food & Nutrition from Oakwood College and a PhD degree in Nutrition from Auburn University. Carson was a principal shareholder of MonaVie and owned, upon information and belief, 10% of MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times,

Carson was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Carson resides in Morristown, Tennessee.

20.     At all relevant times, Amy Cowley ("Cowley") was the Vice President of Finance of MonaVie. Cowley was responsible for financial management, corporate administration and human resources. Cowley has a Bachelor of Science degree in Accounting from the University of Utah and is a Certified Public Accountant. Cowley was a principal shareholder of MonaVie and owned, upon information and belief, 10% of MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times, Cowley was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Cowley resides in North Salt Lake, Utah.

21.     At all relevant times, Mark Rawlins ("Rawlins") was a Director of MonaVie. Rawlins was responsible for supervising corporate governance and the long-term strategic direction of the MonaVie's financial performance. Rawlins has a Bachelor of Science degree in Information Technology from Utah State University. Upon information and belief, Rawlins was a principal shareholder of MonaVie and owned MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times, Rawlins was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Rawlins resides in Orem, Utah.

22.     At all relevant times, Porter Hall ("P. Hall") was a Director of MonaVie. P. Hall was responsible for supervising corporate governance and the long-term strategic direction of the MonaVie's financial performance. P. Hall has a Bachelor of Science degree in Accounting from Brigham Young University and is a Certified Public Accountant. Upon information and belief, P. Hall was a principal shareholder of MonaVie and owned MonaVie's stock prior to the 2010

ESOP Transaction. Thus, at all relevant times, P. Hall was a "party in interest" as to the ESOP as

defined in ERISA § 3(14), 29 U.S.C. § 1002(14). P. Hall resides in Sandy, Utah.

23.     At all relevant times, Stephen Hall ("S. Hall") was a Special Advisor to the Board

of Directors of MonaVie. S. Hall was responsible for consulting with the Board of Directors on

supervising corporate governance and the long-term strategic direction of the MonaVie's

financial performance. S. Hall has a Bachelor of Science degree in Marketing from Boise State

University. Upon information and belief, S. Hall was a principal shareholder of MonaVie and

owned MonaVie's stock prior to the 2010 ESOP Transaction. Thus, at all relevant times, S. Hall

was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). S.

Hall resides in Park City, Utah.

24.     Doe Defendants 1-10 are individual fiduciaries, principal shareholders, and board

members.

## FACTUAL ALLEGATIONS

25.     MonaVie is a Utah limited liability company headquartered in South Jordan,

Utah. MonaVie manufactures and distributes fruit juice beverages. MonaVie's business model is

to distribute its product through multi-level marketing, resembling a pyramid scheme of

distributors. MonaVie was founded by D. Larsen in January 2005.

26.     MonaVie products allegedly combine the juice from açai berry with the juices of

eighteen other fruits and berries, including pomegranates, grapes, pears, cranberries, and

blueberries. MonaVie products are priced at $39 for a bottle of MonaVie original juice. The

bottle contains approximately 25 ounces and has the shape of a wine bottle.

10

27. MonaVie sells its products through a multi-level marketing distribution system. MonaVie ranks its distributors and provides incentives as a distributor progresses through the ranks in the following ascending order of prestige: Star, Bronze, Silver, Gold, Ruby, Emerald, Diamond, Blue Diamond, Hawaiian Blue Diamond, Black Diamond, Royal Black Diamond, Presidential Black Diamond, Imperial Black Diamond, and Crown Black Diamond. MonaVie promotes that its juices contain antioxidants from açaí or other fruits in its blends.

28. MonaVie's 2007 Statement of Policies and Procedures ("Policies and Procedures") provide for income disclosure to distributors and prospective distributors, through a developed Income Disclosure Statement ("IDS"). According to MonaVie's policies and procedures, the IDS was "designed to convey truthful, timely, and comprehensive information regarding the income that MonaVie distributors earn." Further, the MonaVie policies and procedures required an IDS be provided to all prospective distributors, as well as any time distributor compensation was discussed. The IDS also was required to be produced anytime an income claim or earnings representation was made, including statements that refer to average earnings, ranges of earnings, for example "our average Black Diamond distributor makes XXX per month."

29. MonaVie's Policies and Procedures provide that distributors of MonaVie's products cannot use any sales or marketing aids without prior, written authorization of MonaVie. Only those distributors who attained the ranking of Black Diamond or higher were allowed by MonaVie to create and publish their own marketing materials, but MonaVie's policies and procedures required that any marketing or sales items must be reviewed by MonaVie and bear the appropriate review seal before being disseminated or displayed.

30.     MonaVie's Policies and Procedures also allowed distributors to utilize Internet web pages to promote their business, however, all distributors were required to do so through MonaVie's official website or through replicating already approved MonaVie websites. Distributors who reached the rank of Black Diamond or higher were allowed to develop their own websites, but could only use text found on MonaVie's official website and were prohibited from supplementing their websites with text from any source other than MonaVie.

31.     In 2007, the FDA issued a Warning Letter to MonaVie distributor Kevin Vokes for misleading promotional materials claiming that MonaVie was an effective treatment for inflammation, high cholesterol, and muscle/joint pain. Amidst serious criticism, MonaVie issued a statement that many of its distributors may have unwittingly violated its internal advertising practices.

32.     According to MonaVie's 2007 Income Disclosure Statement, a federally required printout of their distributor earnings, most of the sales were generated by selling MonaVie juices to its own salesforce. More than 90 percent were considered "wholesale customers," whose earnings are mostly discounts on sales to themselves.

33.     In July 2008, MonaVie, and several of its top level distributors were sued in this Court by Quixtar, Inc.("Quixtar") and Amway, Corp. ("Amway") for unfair competition and for raiding the sales forces of Quixtar and Amway through false and misleading statements regarding MonaVie's products and the health benefits associated with MonaVie's products.

34.     The lawsuit by Quixtar and Amway named top level MonaVie distributors and particularly described false or misleading sales tactics. Two distributors, John Brigham ("Brig") and Lita Hart (collectively with Brig as the "Harts"), were promoted by MonaVie's website as

12

having achieved the rank of "Imperial Black Diamond Executive" and featured the Harts in at least documentary videos. Quixtar and Amway named the Harts individually in their suit, alleging that each had held recruitment meetings across the country where the Harts tried to recruit and promote sales of MonaVie products through the promotion and circulation of false and misleading statements about the products' health benefits. According to the lawsuit, videos of some of the Harts' recruitment meetings were posted on internet websites, including YouTube.com.

35.     The Quixtar and Amway Complaint alleged one marketing video featured John Brigham interviewing a purported MonaVie customer identified as Chris Sanders from Melrose in the following exchange:

**Brig:**   Okay, well, how long have you been on the product?

**Sanders:**     Three weeks.

**Brig:**   And how much you drinking?

**Sanders:**     Three ounces in the morning and three ounces in the afternoon

**Brig:**   Praise God. That always does my heart good. Okay, what's happened since you been at it?

**Sanders:**     Dropped my blood pressure down to 135 over about 85. It was 190 over 120. Lost five pounds --

**Brig:**   (whisper) Come on.

**Sanders:**     And my sister-in-law just called me tonight. She has fibromyalgia. She had one bottle.

**Brig:**   (whisper) This is good.

**Sanders:**    And her neck and arm stopped hurting, and she's been off it for two days, and now she's begging for another bottle.

36.    According to the Quixtar and Amway Complaint, repeatedly in the Harts' sales meetings, potential MonaVie customers and distributors were told that MonaVie products reduce blood pressure and relieve the symptoms of fibromyalgia despite the fact that MonaVie's products were not approved by the FDA for medicinal use.

37.    The 2008 Quixtar and Amway Complaint also named Jason Lyons ("Lyons") and Carrie Palmieri ("Palmieri") for similar marketing tactics employed by the Harts. In one sales meeting, captured on video and available on the Internet according to the Complaint, Jason Lyons introduced Dr. Lou Niles ("Niles") to promote MonaVie products in the following exchange:

**Lyons:**    Folks, also we have a doctor in the house. You wanna give you're your best three minutes on MonaVie and come in here and share a little bit about it? Dr. Lou Niles.

**Niles:**  I am the guy you don't want to really know because I am the doctor of "last resort" it seems, and I am usually dealing with end-stage cancers . . . I very reluctantly got involved in MonaVie. I only got involved in it when I realized there that something else was going on in the combination of the juices that Dr. Carson put together. And it's more than just fruit juices – it's the combination that seems to be working. So, I have never lost a cancer patient yet . . . The reason is that MonaVie is so loaded with antioxidants and anti-inflammatories that it immediately scrubs all the smoke that is being produced by the body and it immediately stop and slows down oxidation. It can't

14

[prevent oxidation] at 100%, but it slows it down, and if you drink MonaVie on a regular basis for the rest of your life and it becomes part of your menu, you will have put in your body enough antioxidants to keep from aging at a rapid pace. What it also does is it also allows your T-killer cells, which are your immune cells, to arrest a virus, bacteria, fungus or loose cancer cells. That is why it is such a cool product. There is no other food on the planet that can do this.

38.     The 2008 Quixtar and Amway Complaint also alleged that Dr. Niles' outrageous misrepresentations of the healing effects of MonaVie products were found on Club MonaVie Radio via the internet at www.blogtalkradio.com/live2a120/2007/12/09/MONAVIE-FEATURING-OPTI-ACAI.

39.     Yet another distributor, Dr. Farid Zarif ("Zarif"), was sued in the 2008 Quixtar and Amway Complaint for misrepresenting that MonaVie products helped cure cancer and rheumatoid arthritis. Dr. Zarif's comments were captured in videos available to the public on the internet. In those videos, Dr. Zarif recommended at least four ounces of MonaVie juice per day and that MonaVie could help cancer patients, chemotherapy patients, and treat diseases including Osteoporosis and Alzheimer's.

40.     The 2008 Quixtar and Amway Complaint also alleged that Dr. Zarif advertised MonaVie products on the website www.mymonavie.com/drzarif, where Dr. Zarif falsely represents that MonaVie products can treat inflammation, heart disease, cancer, arthritis, obesity, diabetes, asthma, Alzheimer's and allergies. According to the Complaint, these misrepresentations were made freely available to the public.

15

41.     An inventory of many of the outrageous, bogus, and false health claims made by top MonaVie distributors and representatives, all of which were well-documented before the 2010 ESOP Transaction was executed, is attached as Exhibit 1 hereto.

42.     On or about April 30, 2008, Quixtar provided notice through certified mail to MonaVie and its distributors, including the Harts, Lyons, Palmieri, Niles, and Zarif, of the deceptive, misleading and false advertising practices of the MonaVie and its distributors. Quixtar's notice requested that MonaVie and the individual distributors cease making false statements, to take steps to remove false statements from all forms of media, and to publish adequate corrections within ten days.

43.     Several reporters and columnists, including Tony Dokoupil of Newsweek, Jonny Bowden of *The Huffington Post*, Carolyn Susman of *Palm Beach Post*, and Tom Harvey of *Salt Lake City Tribune*, have been critical of the misleading promotional efforts and testimonials of MonaVie distributors.

44.     In August 2008, *Forbes* published an article by Emily Lambert and Klaus Kneale that described MonaVie as a "pyramid atop a pyramid." According to the article, MonaVie recruits distributors on the lure of a sustainable entrepreneurship, selling their distributors motivational lectures and multi-level marketing tools which purportedly helped to increase their sales of MonaVie products. The article explained that MonaVie's business model takes advantaged of ambiguities in the Federal Trade Commission's regulation of pyramid schemes and that only 1% of distributors make any money from their involvement in MonaVie.

45.     In 2008, MonaVie was named as a defendant in a false advertising and trademark infringement suit and was in a multi-issue legal battle with Quixtar/Amway. The lawsuit by

Quixtar, a sister company of Amway, alleged that MonaVie unfairly competed with it by making false claims about its products and that former Amway distributors, now MonaVie distributors, were violating non-compete agreements with Amway. In 2009, similar lawsuits were filed by Oprah Winfrey and Dr. Mehmet Oz against MonaVie alleging false advertising.

46.     In 2009, Orrin and Laurie Woodward were found liable in arbitration for soliciting other distributors to resign from Quixtar to join MonaVie, and were ordered to pay $12,736,659. Several other MonaVie distributors were ordered to pay over $13 million.

47.     MonaVie experiences high turnover of distributors, with only a small percentage of distributors earning enough to make a living. Most distributors become disillusioned with MonaVie's multi-level marketing, and the turnover rates are estimated to be above 50% per year. In 2009, 85% of MonaVie's active distributors received commission checks averaging $35 a week or less. In 2009, R. Larsen acknowledged in an article with *Bloomberg News* that "the company is struggling with independent distributors who promote the juice as a miracle drug."

**2010 ESOP Transaction**

48.     MonaVie is the Sponsor of the ESOP within the meaning of ERISA § 3(16)(B), 29 U.S.C.§ 1002(16)(B). MonaVie adopted the ESOP effective on or about January 2, 2010. Bankers Trust, in its capacity as Trustee of the ESOP, purchased the common stock of MonaVie from the Selling Shareholders (or entities controlled by them) in consideration for payment of $186 million. The sale was seller-funded by a loan agreement where the ESOP financed the buyout and owed $186,496,985 effective November 17, 2010. Presumably, no other lender was willing or would be willing to make this loan based on the questionable value of the collateral stock, therefore MonaVie's employees were stuck with the financing.

49.     Prior to the sale of MonaVie stock to the ESOP, 100% of MonaVie stock was owned by the Selling Shareholders or entities that they controlled. After the sale it is unknown what percentage of MonaVie stock is owned by the ESOP or the Selling Shareholders or entities that they controlled.

50.     MonaVie appointed Bankers Trust as Trustee of the ESOP in 2010 for the purpose of representing the ESOP in the proposed 2010 ESOP transaction. It is unknown whether Bankers Trust hired anyone as its financial advisor for the proposed 2010 ESOP Transaction.

51.     The Selling Shareholders resorted to seller-financing because there were presumably unable to arrange bank financing for the proposed. Any prospective bank lenders would have been troubled by the fact that the proposed ESOP transaction would be 100% leveraged. No reasonably prudent bank would have financed the transaction at the $186 million dollar value without conducting robust due diligence on the loan, including reviewing public information and the Amway lawsuit, to ensure that the collateral pledged, the stock, was actually worth $186 million. Because the Selling Shareholders could not obtain, or knew they could not obtain, bank financing for the transaction, they "financed" the transaction themselves with a 10% note. The 2010 ESOP Transaction's interest rate was more than double the customary rate of 4.25%, which was the then-available rate for issuance of debt with similar terms.

52.     Bankers Trust either failed to conduct adequate due diligence or ignored the facts that were readily available both publicly and within MonaVie in acting as trustee for the 2010 ESOP Transaction. For example, a review of MonaVie's IDS over the previous years would have demonstrated that MonaVie's distributors were not earning as much as they had in the past.

18

Because MonaVie sells its products entirely through multi-level marketing, reduced commissions earnings for its distributors would directly correlate to reduced sales. Bankers Trust could have readily obtained the IDS reports because even prospective distributors with no relationship to MonaVie were purportedly provided a current copy of the IDS whenever distributor earnings were discussed in the recruiting process.

53.     Further, Bankers Trust either failed to conduct adequate due diligence regarding the mounting criticism of MonaVie, its principals, and its top-level distributors. Even a cursory search on the Internet would have revealed scathing articles from such widely read publications as *Forbes, The Huffington Post*, *Palm Beach Post*, or the *Salt Lake City Tribune.* This skeptical view of the benefits of MonaVie's products was widely reported in 2008, and could have been easily discovered by Bankers Trust in 2010.

54.     Even if Bankers Trust ignored or disregard the numerous articles that describe MonaVie's problems, Bankers Trust due diligence review should have included a review of pending and past litigation. Again, an Internet search in federal or state courts would have revealed the lawsuits filed by Qixtar, Amway, Oprah Winfrey, and Dr. Mehmet Oz against MonaVie, not to mention the numerous lawsuits against MonaVie's distributors.

55.     Despite this sea of red flags, Bankers Trust initially valued the ESOP's stock at $186,496,985 and agreed to a loan agreement for a period of fifteen years, on behalf of the ESOP for this same amount on November 17, 2010. The loan bore an interest rate of ten percent (10%) per annum, with a fair value on the note payable of $265,764,839, determined using an interest rate of 4.25% for then available rates for the issuance of debt with similar terms, maturity dates, and nonperformance risk.

56.     The interest rate on the loan was exorbitant. The accountants for the ESOP determined that a fair interest rate for similar private debt transactions was 4.25%. 2010 5500 Financial Statement Note G. Thus not only did the Bankers approve the acquisition of MonaVie stock at vastly inflated values, it also approved a note that was more than double the going rate and that was paid to the very same Selling Shareholders who unloaded the vastly overvalued stock.

57.     In fact, the ESOP is going deeper in the hole on the note. The Selling Shareholders decide at their sole discretion how much to contribute to pay down the note. Not once have the annual contributions been sufficient to service the interest on the note, let alone pay down principal. Bankers Trust essentially blessed a transaction that was doomed to fail and saddled

58.     Within 45 days, the value of the ESOP stock plummeted and lost over $62 million in value. As of December 31, 2010, the ESOP's stock was valued at $122,001,163.

59.     Given the precipitous decline in the value of MonaVie stock, it is implausible that Bankers Trust reviewed or analyzed MonaVie's earning statements, such as the IDS, which was provided to all prospective distributors and would necessarily be made available to every MonaVie distributor marketing the products and recruiting other distributors. Moreover, Bankers Trust failed to prepare a due diligence review of MonaVie's growing revenue and liability issues. If Bankers Trust had followed up with MonaVie regarding these revenue and liability issues or conducted sufficient due diligence, Bankers Trust would have learned that MonaVie's revenues were dwindling while liabilities were piling on.

60.     Bankers Trust almost certainly did not undertake an independent investigation of MonaVie's dwindling revenues, legal trouble and potential liabilities prior to the proposed ESOP transaction. Bankers Trust, *inter alia*, did not obtain or did not consider information about previous or pending lawsuits, claims against the company, or internal documents, such as the IDS which would demonstrate dwindling sales for MonaVie products as part of Bankers Trust's due diligence review of the proposed Transaction.

61.     As of January 3, 2014, the ESOP's stock was valued at 6 cents per share, which values the ESOP's stock at under $772,000, which is less than 0.05% of the original $186 million purchase price. In 2014, the ESOP's stock value has continued to decline and is now essentially worthless.

62.     Currently, ESOP participants are unable to obtain any information concerning the value of their shares, while MonaVie conducts an evaluation of the stock price.

63.     During the period since the Transaction, Bankers Trust has not adequately sought to remedy the overpayments caused by the acts and omissions described above.

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring the First and Second Claims for Relief for violations of ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), as a class action pursuant to Fed. R. Civ. P. 23 (a) and (b), on behalf of all persons who were participants in the ESOP on February 1, 2008, or at any time thereafter, and/or beneficiaries of ESOP participants on February 1, 2008, or at any time thereafter (hereinafter "Plaintiff Class"). Excluded from the Plaintiff Class are the Individual Defendants, and their immediate families; the officers and

directors of Defendant Bankers Trust or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

65.    The Plaintiff Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class Members are unknown to Plaintiff at this time, the ESOP's form 5500 filing for 2013 indicates that there are 458 participants in the ESOP.

66.    Questions of law and fact common to the Plaintiff Class as a whole include, but are not limited to, the following:

      i.    Whether Defendant Bankers Trust engaged in a prohibited transaction under ERISA by permitting the ESOP to purchase MonaVie stock for more than adequate consideration;

      ii.   Whether Defendant Bankers Trust engaged in a prudent investigation of the proposed purchase of MonaVie stock by the ESOP;

     iii.   Whether Defendant Bankers Trust breached its duty of loyalty by making commission or bonus payments to Bankers Trust employees only if the ESOP transaction was consummated;

     iv.   Whether Defendant Bankers Trust breached a fiduciary duty to ESOP participants by causing the ESOP to purchase MonaVie stock for more than fair market value;

      v.   Whether Defendant Bankers Trust breached its fiduciary duties to ESOP participants by failing to adequately investigate and remedy the overpayment by the ESOP in the 2010 ESOP Transaction;

vi.    Whether the Selling Shareholders knowingly participated in Bankers Trust violations of ERISA;

vii.   Whether the Selling Shareholders were fiduciaries for the ESOP in the course of the ESOP Transaction;

viii.  Whether the Selling Shareholders are liable under ERISA for monetary and nonmonetary equitable remedies even if they are not fiduciaries for the ESOP;

ix.    The amount of damages suffered by the ESOP and its participants as a result of Defendant's fiduciary violations.

67.    Plaintiff's claims are typical of those of the Plaintiff Class. For example, Plaintiff, like other ESOP participants in the Plaintiff Class, suffered a diminution in the value of his ESOP account because the ESOP plunged in value after purchasing MonaVie stock for more than fair market value, and he continues to suffer such losses in the present because Defendants have failed to correct the overpayment by the ESOP.

68.    Plaintiff will fairly and adequately represent and protect the interests of the Plaintiff Class. Plaintiff has retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

69.    Class certification of Plaintiff's Claims for Relief for violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications

with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

70.     In addition, Class certification of Plaintiff's Claims for Relief for violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the Class as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' violations of ERISA.

71.     The names and addresses of the Plaintiff Class are available from the ESOP. Notice will be provided to all members of the Plaintiff Class to the extent required by Fed. R. Civ. P. 23.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3),
29 U.S.C. §§ 1132(a)(2) and (a)(3)**

72.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

73.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

74.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

75.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring an action for relief under ERISA § 409.

76.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

77.     Defendant Bankers Trust breached its duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). These breaches include but are not limited to the following:

     i.     Bankers Trust failed to take reasonable steps to determine that it received complete, accurate and current information necessary to value MonaVie's stock;

     ii.     Bankers Trust failed to conduct a reasonable inquiry as to whether the individuals responsible for providing MonaVie's financial projections: (a) had a conflict of interest in regards to the ESOP; and (b) served as agents or employees of persons with such conflicts;

iii.     Bankers Trust did not adequately investigate or evaluate the

reasonableness of the financial projections considered in the proposed

Transaction;

iv.     Bankers Trust did not take reasonable steps necessary to determine the

prudence of relying on MonaVie's financial statements provided to them,

especially in light of the wealth of public information about the company

that cases doubts on the valuation;

v.     Bankers Trust caused the ESOP to pay more than fair market value for

MonaVie stock;

vi.     Bankers Trust failed to conduct a thorough and independent review and

adequately consider whether the 2010 purchase of MonaVie stock from

the Selling Shareholders or the was in the best interests of the ESOP

participants;

vii.     Bankers Trust caused the ESOP to take on excessive debt in connection

with the 2010 ESOP Transaction;

viii.     Bankers Trust failed to undertake an adequate and independent valuation

of the MonaVie stock prior to the 2010 ESOP Transaction;

ix.     Bankers Trust failed to adequately consider all material facts in

negotiating the 2010 ESOP Transaction;

x.     Bankers Trust failed to adequately remedy the ESOP's overpayment for

MonaVie stock at any time between January 2010 and the present.

78.     ERISA § 410 prohibits agreements that purport to relieve a fiduciary from responsibility or liability for any fiduciary duty. 29 U.S.C. § 1110(a). Specifically, § 410 states that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a).

79.     Any indemnification agreement between Bankers Trust, on the one hand, and MonaVie or the ESOP, on the other hand, violates ERISA § 410 and is therefore null and void. Defendant's acts and omissions caused millions of dollars of losses to the Plan and its participants in an amount to be proven more specifically at trial.

**SECOND CLAIM FOR RELIEF**
**Engaging in Prohibited Transactions Forbidden by ERISA §§ 406(a)-(b),**
**29 U.S.C. §§ 1106(a)-(b)**

80.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

81.     ERISA § 406(a), 29 U.S.C. § 1106(a), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing of any property between the plan and a party in interest," or a "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

82.     ERISA § 406(b), 29 U.S.C. § 1106(b), mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or "deal with the assets of the plan in his own interest or for his own account," or "receive any consideration

for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

83.     ERISA § 408(e), 29 U.S.C. § 1108(e) provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a plan if a sale is made for adequate consideration. ERISA § 3(18)(B) defines adequate consideration as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." ERISA's legislative history and existing case law make clear that ERISA § 3(18)(B) requires that the price paid must reflect the fair market value of the asset, and the fiduciary must conduct a prudent investigation to determine the fair market value of the asset.

84.     Defendant Bankers Trust engaged in a prohibited transaction in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), in the 2010 ESOP Transaction, and the prohibited transaction did not meet the conditional exemption requirements of ERISA § 408(e), 29 U.S.C. § 1108(e). Defendant Bankers Trust failed to ensure that the ESOP paid no more than fair market value for the MonaVie stock purchased by the ESOP from the Selling Shareholders, all parties in interest to the ESOP, in 2010. Specifically, the ESOP paid more than fair market value for shares sold by the Selling Shareholders.

85.     Defendant Bankers Trust engaged in a prohibited transaction in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), by causing the ESOP to purchase MonaVie stock for greater than adequate consideration in 2010; causing the ESOP to borrow funds for the 2010 ESOP Transaction, even though the purchase price was inflated; and causing the ESOP to take on excessive debt in connection with the 2010 ESOP Transaction.

86.     Specifically, the ESOP paid more than fair market value for shares sold by the Selling Shareholders, and Bankers Trust failed to conduct an independent and prudent investigation into the fair market price before entering into the stock purchase agreement with MonaVie and the Selling Shareholders.

87.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

88.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief under ERISA § 409.

89.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

90.     Defendant Bankers Trust has caused millions of dollars of losses to the ESOP by the prohibited transactions in an amount to be proven more specifically at trial.

### THIRD CLAIM FOR RELIEF
### Knowing Participation in Violations of ERISA

91.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

92.     ERISA §502(a)(3) permits a claim against parties-in-interest for knowing participation in a fiduciary's violations of ERISA.

93.     The Individual Defendants knew of and participated in Defendant Bankers Trust's violations of ERISA, which are detailed in Plaintiff's First and Second Claims for Relief.

94.     Specifically, each of the Individual Defendants knew before and at the time of the 2010 ESOP Transaction that MonaVie was in dire financial condition, as detailed above. Each of the Individual Defendants knew that: (1) sales of MonaVie products were declining; (2) MonaVie had been widely criticized in various media outlets; (3) several of its top distributors had multi-million dollar judgments entered against them; (4) several of its top distributors and representatives had engaged in routine and repeated false and misleading health claims about MonaVie products; (5) MonaVie was mired in several costly and bitter lawsuits; and (6) virtually all of its sales were to wholesale distributors who left the distribution chain rapidly, rather than to retail consumers.

95.     Despite their knowledge that the ESOP was essentially insolvent and worthless on day one, the Individual Defendants hired Bankers Trust to represent the ESOP as Trustee and knowingly participated in Bankers Trust's violations of ERISA.

96.     The Selling Shareholders reaped millions from the ESOP Transaction.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

**As to the First Claim for Relief:**

A.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative and his counsel as class counsel;

B.     Declare that Defendant Bankers Trust breached its fiduciary duties to the Plaintiff Class;

C.   Enjoin Defendant Bankers Trust from further violations of its fiduciary responsibilities, obligations, and duties;

D.   Issue a preliminary and permanent injunction removing Bankers Trust as fiduciary and Trustee of the ESOP and barring Defendant Bankers Trust from serving as fiduciary or Trustee of the ESOP in the future, and appointing a new independent fiduciary as Trustee of the ESOP;

E.   Order that Defendant Bankers Trust make good to the ESOP and/or to any successor trust(s) the losses resulting from its breaches and restoring any profits it has made through use of assets of the ESOP;

F.   Order that Defendant Bankers Trust provide other appropriate equitable relief to the ESOP, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendant Bankers Trust;

G.   Declare that any indemnification agreement between the Defendant Bankers Trust and MonaVie or the ESOP violates ERISA § 410, 29 U.S.C. § 1110, and is therefore null and void;

H.   Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

I.    Order Defendant Bankers Trust to disgorge any fees it received in conjunction with the 2010 ESOP Transaction as well as earnings and profits thereon;

J.   Order Defendant Bankers Trust to pay prejudgment interest; and

31

K.      Award such other and further relief as the Court deems equitable and just.

**As to the Second Claim for Relief:**

A.      Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative and his counsel as class counsel;

B.      Declare that Defendant Bankers Trust has breached its fiduciary responsibilities to the Plaintiff Class;

C.      Enjoin Defendant Bankers Trust from further prohibited transactions and violations of its fiduciary responsibilities, obligations and duties;

D.      Issue a preliminary and permanent injunction removing Defendant Bankers Trust as fiduciary and Trustee of the ESOP and barring it from serving as fiduciary or Trustee of the ESOP in the future, and appointing a new independent fiduciary as Trustee;

E.      Declare that Defendant Bankers Trust engaged in a prohibited transaction in violation of ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b), by causing the ESOP to purchase MonaVie stock for more than adequate consideration;

F.      Order that Defendant Bankers Trust make good to the ESOP and/or to any successor trust(s) the losses resulting from its breaches and restore any profits it has made through use of assets of the ESOP;

G.      Order that Defendant Bankers Trust provide other appropriate equitable relief to the ESOP, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Bankers Trust;

H.      Order Defendant Bankers Trust to disgorge any fees it received in conjunction with the 2010 ESOP Transaction, as well as an earnings and profits thereon;

I.      Order Defendant Bankers Trust to pay prejudgment interest;

J.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund; and

K.      Award such other and further relief as the Court deems equitable and just.

**As to the Third Claim for Relief:**

A.      Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative and his counsel as class counsel;

B.      Declare that the Individual Defendants knowingly participated in Defendant Bankers Trust violations of ERISA;

C.      Enjoin the Individual Defendants from taking any actions with respect to the ESOP and consistent with any additional orders entered by the Court;

D.      Order that the Individual Defendants disgorge to the ESOP and/or to any successor trust(s) the all monies received by them in connection with the ESOP Transaction and any profits they made through the use of such monies;

E.      Order that the Individual Defendants provide other appropriate equitable relief to the ESOP, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by the Individual Defendants;

F.      Declare that any indemnification agreement between the Defendants and MonaVie or the ESOP violates ERISA § 410, 29 U.S.C. § 1110, and is therefore null and void;

G.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

H.      Order the Individual Defendants to pay prejudgment interest; and

I.       Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Wherefore, Plaintiffs demand a trial by jury on all issues raised by the Complaint and so triable.

DATED this 18th day of December, 2014.

Respectfully submitted,

**MAGLEBY & GREENWOOD, P.C.**

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
Telephone: 801.359.9000
Facsimile: 801.359.9011

**OF COUNSEL**

Gregory Y. Porter, *pro hac vice* pending
 gporter@baileyglasser.com
James L. Kauffman, *pro hac vice* pending
 jkauffman@baileyglasser.com
**BAILEY & GLASSER LLP**
910 17th Street NW, Suite 800
Washington, DC 20006


*Attorneys for Plaintiffs and the Putative Class*